# CRIMINAL COURT OF BALTIMORE CITY.

Filed April 2, 1923.

THE STATE
VS.
C. GRAHAM ARCHER, S. BURNS WILSON.

*Robert F. Leach,* State's Attorney, and *Gaylord L. Clark* for the State.

*William L. Marbury, A. S. J. Owens, Samuel K. Dennis, James McC. Trippe* and *Senator Edward M. Hammond* for the traversers.

STEIN, J.—

At the close of this case counsel for traversers asked leave to file a list of authorities supporting the principles which they thought would control the verdict in this case; after filing which also asked leave to file a brief discussing the evidence, which leave was granted and the brief filed upon the 30th instant.

These briefs, the oral arguments of counsel for the traversers and for the State, were unusually well done, and reflect great credit even upon the distinguished gentlemen who prepared them.

I heard and read the arguments with great interest; examined the briefs and authorities with care, and owing to the importance of the questions presented determined to reduce to writing the reasons upon which the verdict is based.

The indictment charges against three traversers a continuing conspiracy; one, Arthur Gordon, elected to be tried before a jury; the other two, C. Graham Archer and S. Burns Wilson, elected to be tried before the Court. The State elected to proceed with the trial before the Court, of Archer and Wilson.

The crime charged is a continuing conspiracy of the three traversers, "to cheat and defraud the customers of Archer, Harvey & Co." of their moneys and securities; the indictment contains six counts; the first, third and fifth counts, charge the conspiracy as formed on August 11th, 1917; the other three counts each charge its formation on January 1st, 1921; each of the six counts charges the conspiracy as continuing uninterruptedly until December 20th, 1921.

Of the three traversers, Archer was the senior member of the firm of Archer, Harvey & Co.; consisting of O. Howard Harvey and himself, which was formed in March, 1899, with capital of $10,000, to carry on, in the City of Baltimore a stock brokerage business.

Gordon was an employee, who for some years prior to 1916 had been the bookkeeper of the firm; and thereafter, and continually until its failure on December 22nd, 1921, its office manager. Wilson was a friend of both members of the firm, knew Archer eighteen or twenty years, for a long while intimately; knew Harvey about twelve years; was a member of the club to which both belonged; since 1912 or 1913 was a customer of the firm, an habitue of its offices; in July, 1917, had lost in his speculations through it about $70,000, nine-tenths of his personal fortune, and then owed the firm $103,682.

On December 22nd, 1921, the Circuit Court of Baltimore appointed Mr. George Cator, receiver of the firm of Archer, Harvey & Co.; thereafter this firm was adjudicated an involuntary bankrupt and Mr. Cator appointed trustee.

These traversers were presented and indicted charged with having formed a continuing conspiracy to cheat and defraud the customers of Archer, Har-

vey & Co. of their moneys and securities, and after the overruling of a number of motions, pleas and demurrers, the traversers, Archer and Wilson plead (1) not guilty; (2) limitations, to the last plea, the State filed a common traverse.

Testimony was then taken, during which Mr. George Cator, the trustee in bankruptcy produced the firm's books, some of which were offered in evidence over the objections of the two traversers, Archer and Wilson, whose exceptions to the Court's action are preserved.

At the close of the case the traversers filed exceptions to testimony admitted subject to exception, the Court's action on which will appear herein.

From the evidence offered, I find among others the following facts:

(1) That the firm of Archer, Harvey & Co. was formed in March, 1899, to carry on the stock brokerage business in the City of Baltimore; its partners were C. Graham Archer and O. Howard Harvey, each of whom, first contributed one-half of the capital of $10,000, the sum of five thousand dollars; which in the third year was increased by like contributions to $26,600; that thereafter Mr. Harvey loaned the firm $35,000 on bonds and $10,000 in cash.

(2) That throughout the entire life of the firm each partner drew $400 as a monthly salary.

(3) That to the knowledge of Archer the firm was continually and hopelessly insolvent from before August 11, 1917, to December 20, 1921, inclusive.

(4) That prior to August, 1917, Archer knew that unauthorized sales of customers' securities had been made and concealed from the customers, memoranda of which sales even kept on loose sheets, which became so numerous that shortly before August, 1917, Archer gave a firm employee permission to run them through a special account, which account was opened and called on the books of the firm "S. B. Wilson, Special."

(5) That for the purpose referred to in the above finding of fact another account was opened in the name of C. Graham Archer.

(6) That to the knowledge of Archer the books of Archer, Harvey & Co. showed that the traverser Wilson on July 1st, 1917, owed the firm $103,682, which he could not pay, that Wilson was then and has been ever since hopelessly insolvent.

(7) That thereafter while so insolvent and so owing the above large sums of money Archer allowed Wilson to speculate through the firm without putting up any money or paying any interest, and with large and increasing losses; that Archer also allowed Wilson to withdraw from the firm money between $2,000 and $3,000 per year, from August, 1917, so that on December 20th, 1921, through these cash withdrawals and his losses from speculation Wilson owed the firm of Archer, Harvey & Co. $244,404.14, and that during the last four years Archer withdrew from the firm over $90,000.

That S. Burns Wilson knew:

A. That on the first day of July, 1917, he was hopelessly insolvent and owed Archer, Harvey & Co. the sum of $103,682.

B. That the S. Burns Special Account was opened first to allow his name to be used to conceal a fraud, i. e., the unauthorized use of a customer's stock in a short sale made by Archer without the customer's knowledge.

C. That while so insolvent and owing Archer, Harvey & Co. the above-named large sum of money, that firm allowed him to speculate without putting up a margin as is customary, and that the general result of his speculation was to heavily increase losses and indebtedness to the firm.

D. That while making the above losses, and while he did not pay the firm any money, the firm paid him in cash between $2,000 and $3,000 per year, and had his life insured for the benefit of the firm, and the firm paid the premiums thereon.

E. That he knew and allowed the continued use of the S. Burns Wilson special account; that although he claims he thought it was for the benefit of a brother of Archer, he on February 10th, 1921, with that knowledge assigned his interest in that account to the firm; that he with that knowledge signed, swore to and filed two Federal income tax returns based on the profits of that account, of which returns the last was made after the above assignment, and in June, 1921, after the death of the brother to whom

he was told the account belonged, and after the assignment of the account to the firm, went to Washington, D. C., and tried to get an extension of the payment of the second instalment of the income tax.

F. That Wilson was an experienced trader in securities, having been engaged therein continuously since 1912 or 1913; did not work since 1910; lived largely, since August, 1917, if not entirely, off his payments of between $2,000 and $3,000 per year from the firm of Archer, Harvey & Co.; his only employment being for several months in 1918 as bond salesman for that firm, at $5 per month, which employment he took as an evasion of the work or fight law.

That to the knowledge of Archer the following was done:

1. Mrs. Thompson in June, 1920, sent the firm to be sold seven hundred shares Adams Express Company stock, belonging to her, and then in her possession, which she had not bought from that firm, directed them to buy with the proceeds $20,000 of Belgian bonds; the firm sold the stock on June 24, 1920, bought the bonds, did not deliver to Mrs. Thompson either the bonds or the certificates therefor; and on November 12th, 1921, ordered the bonds sold and used the proceeds, without advising Mrs. Thompson of the sale or sending her the proceeds.

2. That on June 21, 1921, Mr. Spalding Lowe Jenkins had an interview at the firm offices with an employee in Archer's presence; that employee then submitting Mr. Jenkins to Archer's knowledge a statement showing that there was due by Jenkins 792 shares of Houston Oil common and preferred stock and 10,000 of Georgia Pacific bonds, and upon the faith of that statement demanded and received from Mr. Jenkins as additional margin 111 shares of U. S. F. & G. Company stock, worth between $14,000 and $15,000 in spite of the fact that on May 31, 1921, the firm owed customers 4,524 shares of that stock and had on hand 126 shares, and on June 30th, 1921, the firm owed to customers 4,269 shares of that stock and had on hand 131 shares; that the Houston Oil stock and the Georgia and Pacific bonds, belonging to Mr. Jenkins had been sold in December, 1920, none of which Jenkins knew and all of which Archer knew.

3. That to Archer's knowledge, Mrs. Mary F. Stump in 1912 bought from, Archer, Harvey & Co. 200 shares of U. S. Steel stock, which the firm sold in February, 1917; of which sale they did not notify her, and of which sale she did not have any knowledge until February 27, 1923, when she heard of it in Court while attending the trial of this case as a witness. That notwithstanding that sale, to the knowledge of Archer, she was required and did put up as additional margin eight $1,000 bonds; that she was charged and did pay interest on the amount due for said shares of Steel stock; sales of which was first carried on a memorandum, as referred to in finding of facts No. 4.

4. That the books of Archer, Harvey & Co. show through the accounts of C. Graham Archer and S. Burns Wilson, Special, sales of securities and stock of a kind, and in instances of amounts carried by only some one of the firm customers, among whom was Messrs. Gittings, Littell, Austin, Thomas, Jenkins and Lackey, and Mrs. Clark and Mrs. Thompson; in most of, if not all of the cases, after selling the stock or securities without authority the firm sent such customers quarterly statements showing that said securities had not been sold, and when the securities had not been paid for, said statements charging such customers with interest on the balance due and in some cases in addition to interest, with a commission for carrying that balance.

5. That Archer sometimes alone, and sometimes after consulting with an employee determined which stocks or securities should be sold.

6. Archer frequently advised customers not to sell securities or stocks who wanted to sell them.

Gordon, who was not on trial, did not testify, but was in Court every day of the trial; no attempt is made herein to discuss his knowledge or relationship to any of the above, so that in the trial of his case, the jury will not be influenced for or against him by any finding of fact on the testimony here discussed. Wilson testified; Archer did not.

The question here is, upon the facts so found what must the verdict be?

The State says guilty; the traversers not guilty; and insists that from these facts no inference can come which will allow a verdict of guilty under a charge for conspiracy.

The rules to be applied in determining the meaning of the above in so far as they bear upon the crime charged are:

Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove that the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation in the conspiracy may be established without showing his name or giving his description.

5 R. C. L., Sec. 37, folio 1088.

When a conspiracy is established, everything said, written or done by either of the conspirators in execution of furtherance of the common purpose is deemed to have been said, done or written by every one of them, and may be proved against each. * * * Acts done in pursuance of the conspiracy are admissible as against all the conspirators, for conspirators are responsible for acts of their fellows which are done in pursuance of the common design. In fact, a conspiracy is proved by such acts more often than by any other method, and they are considered as satisfactory and convincing proof even though they are circumstantial evidence.

5 R. C. L., Sec. 39, folio 1089.

Omitting surplusage under the authority of Rawlings vs. The State, 2 Md. 201-212, that:

"Every fact and circumstance laid in an indictment which is not a necessary ingredient of the offense, may be regarded as surplusage."

14 R. C. L., Sec. 37, notes 11, 12 and 13, Sec. 191.

The crime charged in the indictment is a continuing conspiracy "to cheat and defraud the customers of Archer. Harvey & Co.," to do which required a directing head, one familiar with the firm accounts and business; and a method of concealment; all transactions like those named in the above finding of facts could not have been run through the account of either a member of the firm or of an employee; a customer's account was needed. The transactions through the S. B. Wilson Special Account total a million of dollars.

In a conspiracy, as in every other crime, there must be a criminal intent, a common design and knowledge, none of which need be proven by positive testimony but may be inferred from the evidence.

"In fact, the agreement is almost always a matter of inference deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose."

5 R. C. L., Sec. 5, page 1065.

"As in the case of other offenses, a criminal intent is a necessary element of the crime of conspiracy. Ordinarily, of course, the intent will be inferred from the nature of the combination."

5 R. C. L., Sec. 6, page 1066.

What do we find here:

A firm with an original capital of $10,000, with a total yearly salary to the two partners only, of $9,600, leaving only $400 to pay rent and the other necessary overhead, which firm notwithstanding one or more prosperous years, borrowed from a partner $35,000 in bonds and $10,000 in cash, which was never paid back, and which prior to August, 1917, had sold its customers securities and concealed these sales first by loose memoranda until they became so voluminous as to re-

quire an account to be opened in which to conceal them; this same firm confronted with a loss on one customer of over $103,000; about four times its largest capital, and about one and a half times the total of its capital and loans by the partner.

Take the situation of the firm about the time of opening the S. B. Wilson Account:

Its original capital of $10,000 had been increased to $26,600, treating as capital Mr. Harvey's loan of $35,000 in bonds and $10,000 in cash, it had assets of $71,600, it then had the loss of the Traverser Wilson of $103,682, a deficit of $31,082, in addition to which the partners' yearly salaries amount to $9,600; there were also the expenses of office rent; the salaries of Gordon; Jones, the bookkeeper; Jamison, the wire operator; Harden, perhaps others; in addition there were other items of expense not included in the above, which are part of the usual business overhead; so that in the year 1917 the firm needed $40,682, to take up the above loss growing out of Wilson's debt and the partners' salaries, this in addition to the other items above named, so that when the firm elected to continue business and not to close its doors, Archer, who was the managing partner, had to seek some means of raising money; and adopted that of the unauthorized sale of customers' securities and stocks, first concealing such sales by the loose memoranda above named, and when such slips became so numerous that it became necessary to run them through the books in an account, therefore a customer was selected and the logical man was Wilson.

Harvey and Archer speculated; Gordon speculated; Harvey and Archer carrying 2,000 shares of Houston Oil common. All with the firm money; all lost money. Archer and Gordon in addition to other salaries and losses withdrew from the firm large sums of money.

From 1918 to 1921

| | |
|---|---|
| Archer withdrew cash in addition to his monthly salary of $400.. | $72,346.70 |
| Gordon in addition to his salary withdrew cash .......... | $17,299.30 |

| | | |
|---|---|---|
| Lost in speculations .......... | 57,665.00 | |
| | | 74,964.30 |
| S. Burns Wilson cash losses were: | | |
| S. Burns Wilson No. 1 account...$164,147.15 | | |
| S. Burns Wilson No. 2 account... | 72,064.38 | |
| S. Burns Wilson No. 3 account... | 8,192.51 | |
| | 244,404.14 | |
| Lost before August, 1917 ..... | 103,682.11 | 140,882.03 |
| Total cash taken out of the business in the last four years ..... | | 288,193.03 |
| Four years' salaries of partners | | 34,000.00 |
| Total cash withdrawn in four years ........ | | $322,193.03 |

So in these four years there was a yearly cash need of the firm of $8,000, in addition to a large overhead, all of which was saddled on a business which in August, 1917, was insolvent to the extent of $31,082.11.

Harvey swore he knew nothing of the workings of the business, that Archer was in charge of the office and did know, so that he, Archer, with the insolvent condition of the business known to him, decided to continue. How did he get the money to do so?

The testimony shows that as far back at February, 1917, the 200 shares of the United States Steel belonging to Mrs. Stump had been sold without an accounting therefor, that the accounts of C. Graham Archer and S. Burns Wilson special account contained the sales of large quantities of stock and securities of the kind and frequently of the very amount due customers, and that in every case the customers' quarterly statement not only did not show such sales, but that the accounts treated such securities as due the customers, who were charged interest on the balance and a commission for negotiating the loan.

To carry out such sales and keep them hidden it was necessary to have a customer's account, through whom they could be charged; it would not do to charge all through Archer's ac-

count. Harvey did not know of these sales and it must be assumed that he would not have allowed them because as soon as he learned of the S. B. Wilson Special Account, he at once instituted proceedings in the State Court for a receiver. So that with Archer's consent the S. B. Wilson Special Account was opened in August, 1917, and Wilson notified and assented.

Wilson said Archer explained the opening of the account· by stating it was opened to conceal Archer's unauthorized use in a short sale of some B. & O. stock belonging to a customer; that he, Wilson, assented because he was assured the transaction would only last a day or so and would be all right, so that according to his testimony Wilson gave his assent to the use of that account for a dishonest purpose. He says his next knowledge of that account was when Archer told him it was to conceal transactions of a brother, although with that knowledge Wilson signed and swore to two Federal Income Tax returns based upon that account, one after he had assigned the account to the firm, to whom he knew it did not belong, and in June, 1921, after the death of that brother, and after that assignment he went to Washington, D. C., to try to have extended the time for payment of the second instalment of the Federal Tax, although if he is to be believed he had no interest in its payment after the assignment and death of the brother owning it, as while liable therefor he was insolvent and could not have been made to pay.

When asked to explain why after he had lost about $70,000, nine-tenths of his fortune, and owed over $103,000, he had been allowed to speculate without putting up any margin and instead of paying interest, the firm allowed him to draw down between $2,000 and $3,000 per year, said:

"These accommodations were allowed by every brokerage house in the country, that you can look up any of the bankruptcy proceedings like we have here and you will· see it."

He insists that he had every confidence in the firm of Archer, Harvey & Company, and did not know that the S. Burns Wilson Special Account was to conceal the sale of customers' securities.

While the law requires the State to prove its case beyond a reasonable

doubt and shields one accused with crime with the presumption of innocence, the strongest and most valuable presumption of law, this testimony even undisputed cannot be given any probative force.

That brokers allow their clients to speculate without putting up a margin may be true in a few cases; that in such cases the broker would allow such a customer to draw down profits and the income from stocks and bonds so bought, may be true in fewer cases; that a broker would allow an insolvent customer owing over $103,000 to do so over a space of four years, allowing him also not only not to pay interest, but to withdraw from such an account between $2,000 and $3,000 per year; each year increasing the loss, so that at the end of the fourth year the loss has swelled from more than $103,000 to more than $244,000, cannot be true, save when an unusual motive is present. When you find, as in this case, the broker so allowing the above, at the same time is overdrawing his account by nearly $90,000, and that all of it, that is the broker's and the insolvent customer's withdrawals and losses are paid out of the sales of the securities of other customers, which sales are concealed on the broker's books by being charged to the insolvent customer's account, the kind of motive is found.

Throughout the trial of the case in their oral arguments thereafter, in their brief on the facts just filed, the traverser's counsel insist that the situation here depicted is one for which the law offers no remedy, and which it is powerless either to forbid or prevent; that whatever might be the moral obliquity of the traversers they have not been guilty of the crime charged.

The testimony in the case offered by the State has not been contradicted or explained, is almost all of it corroborated by writing, so could not be contradicted. No attempt to explain has been made, save by Wilson, who denies guilty knowledge and criminal intent, and has produced five gentlemen of character and standing to certify to his good reputation and character.

Considering his good reputation and character for truthfulness, surrounding him and Archer with the presumption of innocence as the law demands, burdening the State with the duty to

prove guilt beyond a reasonable doubt the present record admits of but one verdict, and that is guilty as to each traverser.